Filed 8/12/21  P. v. Wong CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H046282 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. 215150) |
| v. | |
| BRIAN WONG et al., | |
| Defendants and Appellants. | |

From 2013 to 2015, defendants Ben Lew and Brian Wong operated San Jose Organics, a nonprofit corporation that sold marijuana from a storefront in San Jose.  A grand jury indicted defendants on 47 counts including conspiracy to possess marijuana for sale, tax evasion, maintaining a place for unlawful activities involving controlled substances, and providing a space for the sale of a controlled substance.  After the trial court denied defendants' motions to dismiss the indictment, they pleaded no contest to various counts and admitted numerous overt acts.  The court granted a three-year term of probation to both defendants, including 90 days in county jail for Lew and 60 days in county jail for Wong.

Defendants appeal from the trial court's dismissal of their motions to dismiss the indictment with respect to five counts.  First, defendants claim their convictions for tax evasion were invalid because the sales tax statute did not cover sales of marijuana, and if it did, the prosecution for tax evasion violated their Fifth Amendment privilege against self-incrimination.  Second, defendants claim the subsequent passage in 2016 of

Proposition 64, the Control, Regulate and Tax Adult Use of Marijuana Act (AUMA), implicitly repealed the statutes underlying two of their convictions.

For the reasons below, we conclude these claims are without merit. We will affirm the judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Procedural Background

In February 2016, a 47-count grand jury indictment charged defendants with conspiracy to possess marijuana for sale (count 1) and various other offenses arising from their operation of a storefront for the sale of marijuana. (Pen. Code, § 182, subd. (a)(1); Health & Saf. Code, § 11360, subd. (a).) Only five counts are at issue in this appeal: Count 4—maintenance of a place for unlawful activities involving controlled substances (Health & Saf. Code, § 11366); count 5—providing a space for the sale of a controlled substance (Health & Saf. Code, § 11366.5, subd. (a)); and counts 7, 8, and 9—intentional tax evasion (Rev. & Tax. Code, § 7153.5).[1]

Defendants moved to dismiss counts 4, 5, 7, 8, 9, and several others under section 995, based on arguments substantially similar to those put forth on appeal. The trial court denied the motion as to the counts challenged here.

In April 2018, as part of a plea agreement, defendants pleaded no contest to these charges and numerous other counts. The trial court reduced counts 1, 4, and 5 to misdemeanors under section 17, and suspended imposition of sentence. The court placed both defendants on probation for three years with conditions including 90 days in county jail for Lew and 60 days in county jail for Wong.

---

[1] Subsequent undesignated statutory references are to the Revenue and Taxation Code.

Both defendants timely appealed, and the trial court issued certificates of probable cause with respect to the counts challenged on appeal.[2]

### B. Facts of the Offenses[3]

From 2013 to 2015, defendants operated San Jose Organics, which sold marijuana from a storefront leased in the City of San Jose. San Jose Organics was incorporated as a nonprofit mutual benefit corporation with Ben Lew as Chief Executive Officer and Brian Wong as manager of day-to-day operations. San Jose Organics registered with the Board of Equalization and obtained a seller's permit listing "health products, marijuana" among the types of products to be sold. The business reported gross receipts in eFiled tax returns to the Board of Equalization and made sales tax payments on a quarterly basis. The tax returns listed Wong as the preparer under the title "manager."

In July 2015, police executed search warrants at the storefront operation and at Lew's residence. At the storefront, police seized approximately 2,000 pounds of marijuana in various forms and $58,000 in currency. At Lew's residence, police seized approximately $800,000 in currency and a business ledger showing gross sales receipts

---

[2] Defendants supported their requests for certificates of probable cause with a written statement under oath setting forth their statutory challenges as "reasonable constitutional, jurisdictional, or other grounds going to the legality of the proceedings." (Pen. Code, § 1237.5, subd. (a).) As noted in that filing, defendants had petitioned this court for writ relief after the trial court denied their motions to dismiss, and we summarily denied the petition. Defendants' claims do not challenge the sufficiency the evidence or the admission of any evidence, and they raise no factual disputes. Their claims pertain solely to the legal scope of the underlying statutes. The Attorney General does not contend the issues are not cognizable on appeal. These issues concern the prosecution's power to prosecute the charges and are cognizable on appeal as going to the legality of the proceedings. (See *People v. O'Daniel* (1987) 194 Cal.App.3d 715 [claim that prosecution is barred by collateral estoppel is cognizable on appeal after plea of guilty]; *People v. Padfield* (1982) 136 Cal.App.3d 218 [claim that an accusatory pleading on its face shows statute of limitations barred prosecution is cognizable on appeal after no contest plea].)

[3] The facts are taken from the transcripts of the grand jury proceedings and the overt acts admitted by defendants.

for San Jose Organics. Auditors compared the gross receipts recorded in the ledger with the numbers reported to the Board of Equalization and found that the gross receipts reported to the Board of Equalization substantially understated the business's receipts. An auditor estimated the total tax liability to the Board of Equalization to be $1,045,528. Defendants also underpaid marijuana business taxes due to the City of San Jose.

## II. DISCUSSION

### A. Validity of the Tax Evasion Convictions

Defendants contend their convictions for tax evasion on counts 7 through 9 must be reversed because the application of the statute to their conduct is unconstitutional. Defendants first argue that the law at the relevant times did not make marijuana subject to state sales tax because marijuana was contraband and not personal property. They next argue that if the sales tax statutes did encompass illegal marijuana sales, the application of the tax evasion statute to them constituted a violation of their Fifth Amendment privilege against self-incrimination because it compelled them to reveal incriminating information. The Attorney General contends the tax evasion convictions were valid because marijuana constituted personal property subject to sales tax, and defendants' Fifth Amendment rights were not violated.

### 1. Legal Background

#### a. Revenue and Taxation Code Sections

Counts 7 through 9 charged defendants with committing intentional tax evasion over three one-year periods from October 1, 2012, to September 30, 2015, in violation of section 7153.5. That section punishes "any person who violates this part with intent to defeat or evade the reporting, assessment, or payment of a tax or an amount due required by law" where the unreported tax liability amounts to $25,000 or more over a 12-consecutive-month period. (§ 7153.5.) The indictment alleged that defendants made, verified, and filed false and fraudulent tax returns with the intent to defeat and evade the

4

reporting, assessment, and payment of sales tax within the meaning of Revenue and Taxation Code section 6001 et seq.

Section 6051 imposes on all retailers a sales tax "[f]or the privilege of selling tangible property" at a percentage of the gross receipts "from the sale of all tangible personal property sold at retail in this state . . . ." (§ 6051.) "Tangible personal property" means "personal property which may be seen, weighed, measured, felt, or touched, or which is in any other manner perceptible to the senses." (§ 6016.) "Sale" includes "[a]ny transfer of title or possession, exchange, or barter, conditional or otherwise, in any manner or by any means whatsoever, of tangible personal property for a consideration. 'Transfer of possession' includes only transactions found by the board to be in lieu of a transfer of title, exchange, or barter." (§ 6006, subd. (a).)

### b. *Standard of Review*

"[I]n reviewing a trial court's interpretation of a statute, we apply a de novo, or independent, standard of review. [Citation.] In independently interpreting a statute, our task is to ascertain and effectuate the law's intended purpose. [Citation.] In interpreting a statute, we look first to the statute's words. [Citation.] The statutory language is generally the most reliable indicator of legislative intent. [Citation.] If the statutory language is unambiguous, we will presume the Legislature meant what it said and the plain meaning of the statute will prevail unless its literal meaning would result in absurd consequences that the Legislature did not intend. [Citations.]" (*People v. LaDuke* (2018) 30 Cal.App.5th 95, 100.)

### 2. *The Trial Court Did Not Err in Denying the Motion to Dismiss*

Defendants' claim presents two lines of attack. First, they contend the relevant Revenue and Taxation Code sections in effect at the time did not apply to marijuana sales because marijuana is "contraband" which cannot be "personal property." Second, they argue that if those code sections *did* impose a sales tax to their marijuana sales, the prosecution of those statutes against the defendants violated their Fifth Amendment rights

5

against self-incrimination. Defendants urge us to conclude the relevant code sections do not impose a sales tax on marijuana sales so as to avoid rendering the statutes unconstitutional.

### a. The Revenue and Taxation Code as Applied to Illegal Marijuana Sales

In response to the first line of attack, the Attorney General relies on the plain meaning of the applicable code sections. He argues that section 6051 imposes a sales tax on sales of "all tangible personal property," and that the definition of tangible personal property in section 6005—"personal property which may be seen, weighed, measured, felt, or touched"—includes marijuana.

Defendants do not dispute that marijuana falls within the plain meaning definition of tangible personal property as defined in section 6005. They nonetheless argue that because marijuana is "contraband," it cannot be "tangible personal property." They cite no legal authority for this rule. Rather, they extrapolate from older cases concerning legal title in the proceeds of illegal gambling transactions. (See *Asher v. Johnson* (1938) 26 Cal.App.2d 403 (*Asher*); *People v. Rosen* (1938) 11 Cal.2d 147 (*Rosen*); *Lee On v. Long* (1951) 37 Cal.2d 499 (*Lee On*).)

In *Asher*, the taxpayers were operating gambling houses at which their customers would pay money for the privilege of playing on illegal gambling machines analogous to slot machines. (*Asher*, *supra*, 26 Cal.App.2d at pp. 406-407.) If the customer won, the house would pay the customer in merchandise instead of cash. The customer could then exchange the merchandise for the equivalent of its cash value. The state imposed sales taxes on these transactions, and the taxpayers paid the taxes under protest. The taxpayers then challenged the state's imposition of sales taxes on the ground that the money was not derived from the sales of tangible personal property but was instead income from the operation of gambling devices. The trial court adopted the taxpayers' argument, ruled in their favor, and ordered the state to return the money. The state appealed on public

6

policy grounds, arguing that because the funds were illegally derived from the operation of gambling devices, courts should not require the state to return the money.

The court of appeal agreed with the state and reversed the trial court's order. In its analysis, the court of appeal expressly stated it was *not* deciding whether the transactions constituted sales of tangible personal property subject to sales taxes. (*Asher*, *supra*, 26 Cal.App.2d at p. 407.) The court explicitly premised its analysis on a stipulation entered in the trial court that the taxpayer " 'was not, during said period, and is not now, and never has been engaged in the business of selling tangible personal property at retail or otherwise.' " (*Ibid.*) The court reversed the trial court based solely on public policy grounds, applying "the wholesome rule to refuse to lend the aid of the court to restore property acquired and claimed as the proceeds of illegal gaming." (*Id.* at pp. 413-414.) In the course of this analysis, the court quoted the California Supreme Court, which had held, "It is the law in this state that certain games of chance, such as lotteries, are illegal; that the winner gains no title to the property at stake nor any right to possession thereof; and that the participants have no standing in a court of law or equity." (*Rosen*, *supra*, 11 Cal.2d at p. 150.) (See also *Lee On, supra,* 37 Cal.2d at pp. 500-501 [affirming judgment denying the right of gambling house operators to recover proceeds of illegal gaming operations on the ground that courts will not lend assistance to persons whose claim for relief rests on an illegal transaction].)

*Asher* and the related cases do not support the defendants' claim that marijuana, as contraband, cannot be tangible personal property. Those cases solely concerned the ability of gambling house operators to use the courts to recover the monetary proceeds of their illegal gambling operations, not the issue of whether contraband is tangible personal property under the sales tax statutes. None of these cases held that the sales of illegal contraband may not be taxed. To the contrary, the *Asher* court held, "It is fundamental that an unlawful business may be taxed by governmental agencies." (*Asher, supra,* 26 Cal.App.2d at p. 412.)

7

As the Attorney General points out, the state taxes the sales of counterfeit goods as tangible personal property. (§ 6007, subd. (b)(1).) Defendants argue that the Legislature's enactment of this specific exception proves the general rule that sales of contraband are not taxable. (See *People v. Galambos* (2002) 104 Cal.App.4th 1147, 1161 [applying "expressio unius est exclusio alterius" canon of statutory construction].) But "[t]his rule, of course, is inapplicable where its operation would contradict a discernible and contrary legislative intent." (*Wildlife Alive v. Chickering* (1976) 18 Cal.3d 190, 195.) Here, the legislative intent is readily discernible from the plain meaning of the statute defining "tangible personal property" as "personal property which may be seen, weighed, measured, felt, or touched, or which is in any other manner perceptible to the senses." (§ 6016.) Because the plain meaning of this language unambiguously includes marijuana, we need not resort to canons of statutory construction to apply this code section.

Defendants argue that the 2016 passage of Proposition 64, also known as the Control, Regulate and Tax Adult Use of Marijuana Act (AUMA), shows that sales of marijuana were not taxable prior to that act. The AUMA created a new tax under section 34011: "Effective January 1, 2018, a cannabis excise tax shall be imposed upon purchasers of cannabis or cannabis products sold in this state at the rate of 15 percent of the average market price of any retail sale by a cannabis retailer." (§ 34011, subd. (a)(1).) Defendants contend that because the AUMA specifically created a sales tax for marijuana, this implies marijuana was not taxable before the AUMA was enacted. As the Attorney General points out, however, this section creates an excise tax, not a sales tax. The section expressly states that the excise tax applies in addition to any sales and use taxes imposed by the state or local government. (§ 34011, subd. (c).)

Defendants further argue that the AUMA retroactively reduced their tax evasion offenses to misdemeanors, pointing to section 34016. Their argument misreads that code section. Section 34016 generally establishes the power of certain persons to conduct

inspections at marijuana sellers' establishments. Subdivision (d) provides, "Any person who renders a false or fraudulent report is guilty of a misdemeanor," and subdivision (e) provides, "Any violation of any provisions of *this part*, except as otherwise provided, is a misdemeanor." (§ 34016, subds. (d) & (e), italics added.) The first subdivision does not apply to sales taxes, and the second subdivision is limited to "this part," which is distinct from the Revenue and Tax Code sections establishing the sales tax that defendants were charged with evading.

For all these reasons, we agree with the Attorney General that the defendants' sales of marijuana were covered by the Revenue and Taxation Code sections governing the taxation of sales during the relevant period.

### b. *The Privilege Against Self-Incrimination Does Not Shield Defendants from Prosecution*

Defendants next argue that if the sales tax laws cover the illegal sales of marijuana then the enforcement of those laws against them violated their Fifth Amendment privilege against self-incrimination. For this proposition, defendants rely on *Marchetti v. U.S.* (1968) 390 U.S. 39 (*Marchetti*) and its progeny. (See *Grosso v. United States* (1968) 390 U.S. 62 [prosecution for failure to pay excise tax on illegal wagering activity should have been dismissed because compliance with statute would have infringed defendant's privilege against self-incrimination]; *Haynes v. United States* (1968) 390 U.S. 85 [prosecution for failure to register firearms should have been dismissed because the registration requirement violated the privilege against self-incrimination]; *Leary v. United States* (1969) 395 U.S. 6 [invocation of privilege against self-incrimination should have provided a full defense to a prosecution for failure to pay transfer tax on marijuana].)

The Attorney General argues that the Fifth Amendment's privilege against self-incrimination is purely personal and does not apply here because the taxes were owed by San Jose Organics, which was a corporation. (See *City of San Jose v. MediMarts, Inc.*

9

(2016) 1 Cal.App.5th 842 (*MediMarts*).)  The Attorney General further contends the sales tax statute does not pose a substantial risk of self-incrimination and does not target a specific group suspected of criminal activity, which are necessary elements for a valid Fifth Amendment claim under *Marchetti* and its progeny.

*Marchetti* concerned a federal statute that imposed an occupational tax on wagering.  (*Marchetti*, *supra*, 390 U.S. at pp. 40-41.)  The statute required persons who accepted wagers to register with the local internal revenue office.  The office was then required to maintain a listing of the persons who had paid the tax and to provide the listing to state prosecutors.  The United States Supreme Court held that the Fifth Amendment provided a defense against the prosecution because the statute required Marchetti "to provide information which he might reasonably suppose would be available to prosecuting authorities, and which would surely prove a significant 'link in a chain' of evidence tending to establish his guilt."  (*Id.* at p. 48.)  The high court noted that the statute was "directed at a 'selective group inherently suspect of criminal activities.' "  (*Id.* at p. 57.)  The court further held, "We emphasize that we do not hold that these wagering tax provisions are as such constitutionally impermissible; we hold *only that those who properly assert the constitutional privilege* as to these provisions may not be criminally punished for failure to comply with their requirements.  If, in different circumstances, a taxpayer is not confronted by substantial hazards of self-incrimination, or if he is otherwise outside the privilege's protection, nothing we decide today would shield him from the various penalties prescribed by the wagering tax statutes."  (*Id.* at p. 61, italics added.)

Defendants' case is distinguishable from *Marchetti*.  First, defendants did not properly assert the constitutional privilege against self-incrimination in response to the tax statute.  To the contrary, they registered with the Board of Equalization to obtain a seller's permit listing their products as "health products, marijuana" and they partially paid sales taxes for eight quarters.  They did not assert their Fifth Amendment rights until

10

after they were prosecuted for the *underpayment* of these taxes. The principles of waiver and estoppel would preclude any assertion of the privilege against self-incrimination in these circumstances. (See *Minnesota v. Murphy* (1984) 465 U.S. 420, 427 [if a witness voluntarily makes incriminating disclosures instead of claiming the privilege, the government has not "compelled" him or her to self-incriminate].) *Marchetti*, by contrast, concerned a taxpayer who willfully failed to pay the required tax. (*Marchetti*, *supra*, 390 U.S. at p. 41.)

Second, the privilege against self-incrimination under *Marchetti* only applies when the statute requiring disclosure of incriminating information is directed at a " ' "highly selective group inherently suspect of criminal activities." ' " (*People v. Kurtenbach* (2012) 204 Cal.App.4th 1264, 1284, quoting *Marchetti*, *supra*, 390 U.S. at p. 57.) "[T]he defense is not available when a statute requires disclosure in ' "an essentially noncriminal and regulatory area of inquiry." ' " (*Ibid.*) In *Marchetti*, for example, the challenged statutes expressly taxed wagering and required liable taxpayers to register with a local internal revenue office by filing a form stating whether they were engaged in accepting wagers. The internal revenue office was required to maintain a list of such taxpayers and to provide certified copies of the list to any state or local prosecutor upon request. (*Marchetti*, at pp. 42-43.) Here, the sales tax statute is not specifically directed at any highly selective group suspect of criminal activities. It applies generically to "the sale of all tangible personal property sold at retail in this state." (§ 7153.5.)

Third, as the Attorney General points out, the taxpayer here was San Jose Organics—a corporation, which under the collective entity doctrine has no Fifth Amendment privilege against self-incrimination. (*United States v. White* (1944) 322 U.S. 694, 699 ["Since the privilege against self-incrimination is a purely personal one, it cannot be utilized by or on behalf of any organization, such as a corporation."].) The Attorney General contends this principle applies equally to defendants as individual persons because they acted as agents of San Jose Organics. For this proposition, the

11

Attorney General relies on *MediMarts*, *supra*, 1 Cal.App.5th 842. In *MediMarts*, the City of San Jose sued a marijuana dispensary and its president David Armstrong to collect unpaid business taxes. The defendants claimed payment of the business taxes would force Armstrong to incriminate himself in violation of his Fifth Amendment privilege against self-incrimination. Applying the collective entity doctrine, we held that neither MediMarts as a corporate entity nor Armstrong as its president were entitled to assert the privilege. "The underlying principle of this doctrine, as repeatedly explained by the United States Supreme Court, is that a corporate officer may not rely on the Fifth Amendment when required to produce the records of the corporation." (*Id.* at p. 851.) " '[R]epresentatives of a collective entity act as agents, and the official records of the organization that are held by them in a representative rather than a personal capacity cannot be the subject of their personal privilege against self-incrimination, even though production of the papers might tend to incriminate them personally ... Any claim of Fifth Amendment privilege asserted by the agent would be tantamount to a claim of privilege by the corporation, which possesses no such privilege.' " (*Ibid.*, quoting *Braswell v. U.S.* (1988) 487 U.S. 99, 99-100.) "Thus, while business records of a sole proprietor or practitioner may be protected from release by the Fifth Amendment, an individual 'cannot rely upon the privilege to avoid producing the records of a collective entity which are in his possession in a representative capacity, even if these records might incriminate him personally.' " (*Id.* at pp. 851-852.)

Because the defendants here were representatives of the corporate entity San Jose Organics, the holding of *MediMarts* applies with equal force to them. The United States Supreme Court has further reiterated that the simple filing of a tax return does not by itself implicate the privilege against self-incrimination. "[T]he fact that incriminating evidence may be the byproduct of obedience to a regulatory requirement, such as filing an income tax return, maintaining required records, or reporting an accident, does not

12

clothe such required conduct with the testimonial privilege." (*U.S. v. Hubbell* (2000) 530 U.S. 27, 35.)

For the reasons above, we conclude the prosecution of defendants for the underpayment of sales tax did not violate their Fifth Amendment privilege against self-incrimination.

## B. *Effect of Proposition 64 on Counts 4 and 5*

Defendants contend the 2016 passage of Proposition 64, establishing the AUMA, implicitly repealed the statutory provisions underlying their convictions in count 4 (Health & Saf. Code, § 11366 [maintenance of a place for unlawful activities involving controlled substances]) and count 5 (Health & Saf. Code, § 11366.5, subd. (a) [providing a space for the sale of a controlled substance].) The Attorney General argues that the AUMA neither expressly nor implicitly repealed those code sections.

### 1. *Legal Principles*

As relevant here, Health and Safety Code section 11366 punishes "[e]very person who opens or maintains any place for the purpose of unlawfully selling, giving away, or using a controlled substance" including marijuana. (Health & Saf. Code, § 11366.) Subdivision (a) of Health and Safety Code section 11366.5 punishes "[a]ny person who has under his or her management or control any building, room, space, or enclosure, either as an owner, lessee, agent, employee, or mortgagee, who knowingly rents, leases, or makes available for use, with or without compensation, the building, room, space, or enclosure for the purpose of unlawfully manufacturing, storing, or distributing any controlled substance [including marijuana] for sale or distribution." (Health & Saf. Code, § 11366.5, subd. (a).)

The AUMA legalized certain types of personal use and cultivation of marijuana for adults 21 years of age or older, and the AUMA reduced criminal penalties for specified marijuana-related offenses. The AUMA included provisions on regulation, licensing, and taxation of legalized marijuana use. Among other provisions, the AUMA

13

added Health and Safety Code section 11362.1, legalizing possession of certain amounts of cannabis by persons 21 years of age or older. Subdivisions (a)(1) and (a)(2) of Health and Safety Code section 11362.1 specifically allow persons aged 21 of older to "[p]ossess, process, transport, purchase, obtain, or give away to persons 21 years of age or older without any compensation whatsoever" certain amounts of cannabis and concentrated cannabis. The AUMA also reduced from felonies to misdemeanors violations of Health and Safety Code sections 11359 (illegal possession of cannabis for sale) and 11360 (illegal transportation of cannabis for sale).[4] The AUMA further added section 11362.45, which expressly sets forth other code sections that were *not* amended or repealed by section 11362.1. Health and Safety code sections 11366 and 11366.5 are not among the code sections listed in Health and Safety Code section 11362.45.

"In interpreting a voter initiative . . ., we apply the same principles that govern statutory construction. [Citation.] Thus, 'we turn first to the language of the [initiative], giving the words their ordinary meaning.' [Citation.] The [initiative's] language must also be construed in the context of the statute as a whole and the [initiative's] overall . . . scheme." (*People v. Rizo* (2000) 22 Cal.4th 681, 685.) "Absent ambiguity, we presume that the voters intend the meaning apparent on the face of an initiative measure [citation] and the court may not add to the statute or rewrite it to conform to an assumed intent that is not apparent in its language." (*Lesher Communications, Inc. v. City of Walnut Creek* (1990) 52 Cal.3d 531, 543.)

" '[A]ll presumptions are against a repeal by implication. [Citations.]' [Citation.] Absent an express declaration of legislative intent, we will find an implied repeal 'only when there is no rational basis for harmonizing the two potentially conflicting statutes [citation], and the statutes are "irreconcilable, clearly repugnant, and so inconsistent that the two cannot have concurrent operation." ' [Citation.]" (*Garcia v. McCutchen* (1997)

---

[4] Defendants do not challenge their conviction for conspiracy to possess marijuana for sale.

14

16 Cal.4th 469, 476-477.) "Because 'the doctrine of implied repeal provides that the most recently enacted statute expresses the will of the Legislature' [citation], application of the doctrine is appropriate in those limited situations where it is necessary to effectuate the intent of drafters of the newly enacted statute. ' "In order for the second law to repeal or supersede the first, the former must constitute a revision of the entire subject, so that the court may say it was intended to be a substitute for the first." ' [Citation.]" (*Professional Engineers in California Government v. Kempton* (2007) 40 Cal.4th 1016, 1038.) Repeal may be found where (1) the two acts are so inconsistent that there is no possibility of concurrent operation, or (2) the later provision gives undebatable evidence of an intent to supersede the earlier provision. (*Ibid.*)

### 2. *The AUMA Did Not Repeal Health and Safety Code Sections 11366 and 11366.5*

The Attorney General contends nothing in the AUMA expressly repealed Health and Safety Code sections 11366 and 11366.5, and defendants do not dispute this. Defendants rely solely on the doctrine of implied repeal and the general statements of intent and purpose as set forth in the AUMA. The Attorney General argues that defendants have failed to overcome the strong presumption against implied repeal. Defendants point to the voters' intent, as expressed in the text of the AUMA, to establish a "comprehensive system" to legalize, control, and regulate the cultivation, processing, manufacture, distribution, and sale of nonmedical marijuana. Defendants argue that because the challenged sections are not included in the list of code sections designated as *not* amended or repealed as set forth in Health and Safety Code section 11362.45, this shows voters intended to repeal the challenged sections.

We are not persuaded that defendants have overcome the presumption against implied repeal. Defendants argue the challenged code sections would allow prosecutors to charge persons for maintaining places to distribute marijuana in a fashion that would otherwise be lawful under the AUMA. But as the Attorney General points out, the

15

challenged code sections prohibit conduct that is performed "unlawfully"—which, in the context of the AUMA, would apply to persons who maintain spaces to distribute marijuana in ways the AUMA did not legalize, e.g., in prohibited quantities, or without adhering to other legal restrictions.  This interpretation of the relevant Health and Safety Code sections would allow for them to operate concurrently and consistently.  And despite defendants' repeated invocation of the "comprehensive" nature of the AUMA changes to the law, there is nothing in the legislative history that would constitute undebatable evidence of an intent to repeal the challenged code sections.

For the reasons above, we conclude this claim is without merit, and we will affirm the judgment.

### III.    DISPOSITION

The judgment is affirmed.

_____

Greenwood, P.J.


WE CONCUR:




_____

Elia, J.








_____

Grover, J.






People v. Wong et al.
No. H046282